Filed 7/18/16  In re R.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>M.O. et al.,<br><br>     Defendants and Appellants. | G052902<br><br>(Super. Ct. Nos. DP024980, DP024981, DP025118)<br><br>O P I N I O N |

Appeals from an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant M.O.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant Ma.H.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

\*        \*        \*

## INTRODUCTION

The juvenile court found, pursuant to Welfare and Institutions Code section 366.26, that R.H. (now four years old), J.H. (now three years old), and Mi.H. (now two years old) were adoptable, and that none of the exceptions to termination of parental rights applied. (All further statutory references are to the Welfare and Institutions Code.) The court therefore terminated the parental rights of Ma.H. (father) and M.O. (mother). Both father and mother separately appealed. Because substantial evidence supports the juvenile court's findings, we affirm the order.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Based on injuries inflicted on J.H. by mother, the juvenile court declared J.H., as well as his siblings, Mc.H., R.H., and Mi.H., to be dependents of the juvenile court. The court also denied reunification services to mother and father for all the children, except Mc.H., and found all four children would suffer detriment if they were to remain in mother and father's custody and control. The facts leading to the court's jurisdiction and disposition orders are detailed in two previous unpublished opinions, *Ma.H. v. Superior Court* (Aug. 27, 2015, G051997) and *In re Mc.H.* (Jan. 8, 2016, G052211.)

Mc.H. and R.H. were originally placed together with their maternal grandmother, while J.H. and Mi.H. were placed together in a licensed foster home.

2

Later, J.H. and Mi.H. were moved to a concurrent planning home, and R.H. was moved to the same home a couple of months later. Mc.H. remained with his grandmother.

Following the jurisdiction and disposition hearing, mother and father were granted six hours of weekly monitored visitation with the children. Mother visited consistently, while father's visitation was sporadic due to his changing work schedule. The visits were appropriate, but neither mother nor father was able to "set limits with the children," and both displayed poor judgment and noticeably gave preferential treatment to some of the children. Both mother and father reacted negatively toward the monitor and ignored the monitor's guidance. Father was "hostile and threatening during a visit with a monitor in the presence of the children."

In August 2015, the Orange County Social Services Agency (SSA) filed a report pursuant to section 366.26, with respect to R.H., J.H., and Mi.H. The report stated that the foster home in which they were placed was a prospective adoptive home, and the foster parents wished to adopt all three of them. All three were happy, adjusting well, and thriving in the prospective adoptive home.[1]

SSA reported that although there was a relationship between mother and father and the children, it did not outweigh the benefits of permanency in an adoptive home: "There does not appear to be any detrimental [e]ffects to the separation of the children from their biological family after visits or any time in between." While the children were happy to see mother and father, they were equally as happy to see the prospective adoptive parents when they were picked up after visits. The children did not ask for or talk about mother, father, or Mc.H. between visits. The prospective adoptive parent reported that R.H. was more defiant, and more bossy, controlling, and mean

---

[1] In a report prepared in July 2014, SSA had deemed R.H., J.H., and Mi.H. only probable for adoption because they were considered difficult to place as members of a sibling group, and because of J.H.'s physical disability.

3

toward J.H. and Mi.H. after visits.  The prospective adoptive parents also reported that if they were to adopt R.H., J.H., and Mi.H., they would maintain contact with Mc.H.

In the section 366.26 report, SSA made the following assessment and recommendations:

"The children . . . are currently placed in the home of . . . the prospective adoptive parents for the children.  [The prospective adoptive parents] are currently willing and able to be the adoptive parents to the children and the children are observed to [be] comfortable, happy and content in the home . . . .  Although the undersigned has only met with the children and the caretakers together on two occasions, the relationship appears to be strong.  Both of the prospective adoptive parents and each child seems to have mutual admiration and regard for one another and the prospective adoptive parents have repeatedly stated that they love the children unconditionally.  The children respond positively to [the] prospective adoptive parents, as evidence[d] by the children looking to the prospective adoptive parents for guidance and approval.

"The prospective adoptive parents have provided for the care and well being of the child[ren] since the children's placement with them and have met all of their social, emotional, physical, and developmental needs.  The prospective adoptive parents are licensed foster parents and have an approved homes study.

"Both of the children's biological parents have been approved for six hours a week of monitored visits for which the children's mother has consistently attended. The children's father . . . has been less consistent in his visitation.  Although the children's father has been approved for six hours of visitation per week, his attendance to visits has only been three to four hours a week.  For the most part the children's parents are appropriate during their visits; however, both have difficulty setting limits with the children and using good judgment during visitation.  In addition, the father did get hostile and threatening during a visit with a monitor in the presence of the children, which illustrates poor judgment and poor anger management skills.

4

"Although there is a relationship between the children and their biological parents, the relationship between the children and the biological parents does not outweigh the benefit of permanency of the three children together in an adoptive home. The children readily go to the prospective adoptive parents after their visitation with their biological parents and do not protest leaving the biological parents. There does not appear to be any detrimental [e]ffects to the separation of the children from their biological family after visits or any time in between.

"Based on the aforementioned information, it does not appear that it would be detrimental to terminate parental rights. Further, it is the undersigned's belief that it is in the children's best interest to be adopted by their current caretakers. The caretakers reported that they love the children very much and have stated that they are committed to adopting the children. It is therefore recommended that the Court terminate the parental rights of R[.H.], J[.H.] and M[i.H.]'s parents, so that they may be freed up for adoption."

SSA's recommendation remained the same in the addendum reports.

Mc.H., now 11 years old, filed a section 388 petition in October 2015, seeking permission to participate at the section 366.26 hearing regarding his siblings. The petition alleged that Mc.H. and his siblings were very close and needed each other for comfort. Mc.H. stated that because he and J.H. have the same congenital disability in their hands, they have a special bond, and Mc.H. can help J.H. face life in a way no one else can. After a hearing, and over SSA's objection, the juvenile court granted Mc.H.'s petition.

The SSA social worker was the only witness at the section 366.26 hearing. Following testimony and argument, the juvenile court found, by clear and convincing evidence, that R.H., J.H., and Mi.H. were adoptable. The court also found that none of the exceptions to adoption applied. The court then found that termination of parental rights was in the best interests of R.H., J.H., and Mi.H. Mother and father filed separate, timely notices of appeal.

5

On appeal, father and mother argue the juvenile court erred in concluding the section 366.26, subdivision (c)(1)(B)(i) and (v) exceptions to termination of parental rights did not apply.

## I.

### STANDARD OF REVIEW

Section 366.26, subdivision (c)(1)(B) allows the juvenile court to decline to terminate parental rights over an adoptable child if it finds "a compelling reason for determining that termination would be detrimental to the child" either because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) or because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption" (§ 366.26, subd. (c)(1)(B)(v)). Father and mother had the burden of proving all prongs of these exceptions were satisfied. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 949.)

"[T]he review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. [Citation.] The . . . juvenile court's decision whether an adoption exception applies involves two component determinations. 'Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination.' [Citation.] The second

determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a "*compelling reason* for determining that termination would be detrimental"' to the child. [Citation.] This ""'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," is appropriately reviewed under the deferential abuse of discretion standard.' [Citations.]" (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531.)

## II.

### PARENTAL RELATIONSHIP EXCEPTION[2]

SSA does not dispute that mother met the first prong of the parental relationship exception to adoption—that mother maintained regular visitation and contact with R.H., J.H., and Mi.H. Mother regularly and consistently visited with the children as authorized by the juvenile court's order, and her monitored visits were appropriate. We therefore consider whether there was substantial evidence that mother had a significant, positive, and emotional attachment with the children.

In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, the court explained: "In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child

---

[2] Father does not make a separate argument regarding the applicability of the parental relationship exception. Father does argue, correctly, that if the order terminating parental rights were to be reversed as to mother on this ground, it must be reversed as to father as well. (Cal. Rules of Court, rule 5.725(a)(2); *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110.)

7

relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.  [¶] Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."

In late 2014 and early 2015, R.H. cried after visits and asked if she could go home with mother.  As we noted in *Ma.H. v. Superior Court*, *supra*, G051997, in determining whether the juvenile court erred in denying reunification services to mother: "There was evidence that R.H. and mother had a positive bond.  At many visits, R.H. would cry and ask to go home with mother.  R.H. also cried after visits with mother. However, their bond was not exceptionally close.  The foster father testified that while it originally took about 10 minutes for R.H. to calm down and stop crying after a visit, she was later able to separate from mother after visits without crying or becoming emotional. The social worker testified that while R.H. definitely had a bond with mother and father, terminating R.H.'s relationship with mother would not be detrimental because R.H. was 'able to form a bond with the caretakers that she's with now or other people.'  By March 2015, R.H. was referring to the foster mother as 'mommy.'"

Following the disposition hearing, mother continued to consistently participate in visitation, although the visits remained monitored.  Mother was occasionally inattentive during the visits, and continued to have problems setting limits, disciplining, and accepting guidance from the monitors.  R.H., J.H., and Mi.H. had fewer

and fewer problems separating from mother after visits, and did not ask about mother between visits.

The juvenile court did not abuse its discretion in concluding, based on the foregoing evidence, that mother's relationship with R.H., J.H., and Mi.H. did not outweigh the benefits they would obtain by being freed for adoption. All three of the children had adjusted well in the prospective adoptive home. The prospective adoptive parents had a close bond with the children, and had remained consistent in their commitment to adopt them. Mother did not establish a relationship between herself and any of the children, which provided him or her with "a substantial, positive emotional attachment such that the child would be greatly harmed" if it were severed. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

### III.

#### SIBLING RELATIONSHIP EXCEPTION

The prospective adoptive parents expressed their intention to preserve the relationship between Mc.H. and R.H., J.H., and Mi.H. Thus, one of the necessary elements of the sibling relationship exception to adoption—that adoption would substantially interfere with a sibling relationship—has not been proven in this case.

In *In re Megan S.* (2002) 104 Cal.App.4th 247, 254, the court held that the sibling relationship exception to adoption could not apply because the evidence demonstrated that the bond between the siblings would not be disrupted. The court's holding acknowledged there was "no guarantee that sibling contact would be continued after adoption." (*Ibid.*) Despite father's argument to the contrary, the lack of a contractual agreement by the prospective adoptive parents to facilitate sibling contact postadoption does not require that the sibling relationship exception be applied.

We recognize the special bond between Mc.H. and J.H. Nevertheless, because the necessary element of substantial interference with a sibling relationship has

9

not been established, we need not consider the significance of the sibling bonds or weigh the benefits of maintaining the relationship versus adoption.

DISPOSITION

The order is affirmed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.